# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| SSAB ALABAMA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 17-0175-WS-C |
| | ) |
| KEM-BONDS, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER**

This matter comes before the Court on defendant Kem-Bonds, Inc.'s Motion for Partial Summary Judgment (doc. 37). The Motion has been briefed and is now ripe for disposition.

**I.  Background Facts.**

The basic facts giving rise to this dispute have not been controverted for purposes of the present Motion. Plaintiff, SSAB Alabama, Inc., operates a recycling steel mill in Axis, Alabama. During the steel-making process, SSAB utilizes a product known as tap-hole sand (also known by the trade name EZ-POR). At all relevant times, SSAB purchased EZ-POR directly from defendant, Kem-Bonds, Inc. SSAB maintains that in June 2016, its Axis facility experienced multiple "burn-through" incidents in which the tap-hole sand supplied by Kem-Bonds catastrophically failed,[1] thereby causing SSAB to suffer significant property loss damages, production delays and lost profits. According to SSAB, the tap-hole sand furnished by Kem-Bonds failed because it was defective, in that it had a loss-of-ignition value well in excess of the industry standard of 2%.[2]

---

[1] In the Amended Complaint, SSAB describes this product failure as follows: "As a result of this defective product …, the tap-hole sand allowed 240 tons of 3,000 degree liquid steel to find a path through the defective sand and burn through the tap-hole gate prior to the ladle reaching the tap position." (Doc. 24, ¶ 15.)

[2] For its part, Kem-Bonds vigorously denies that the product it supplied to SSAB was defective in any respect. (*See* doc. 37, ¶¶ 24 ("KBI denies that its product, EZ-POR was defective"), 31 ("KBI denies that its products were defective, or contributed in any way to
(Continued)

Based on these events, SSAB brought this action to assert state-law claims against Kem-Bonds on theories of breach of contract (Count One), breach of warranty (Count Two) and the Alabama Extended Manufacturer's Liability Doctrine (Count Three).  In Count One, SSAB alleges that Kem-Bonds breached the direct contracts set forth in SSAB's purchase orders numbered MB153592 and MB151229 by supplying SSAB with tap-hole sand that did not satisfy industry standards, failing to perform chemical testing and analysis of its product, and failing to notify SSAB that it had secured a different supplier.  (Doc. 24, ¶ 11.)  In Count Two, SSAB alleges that by selling it defective tap-hole sand, Kem-Bonds "breached its express and implied warranties to SSAB including … the express warranty section found in paragraph ten of the terms and conditions …, as well as the implied warranty of merchantability and the implied warranty of fitness for a particular purpose." (*Id.*, ¶ 17.)  Finally, in Count Three, SSAB alleges that Kem-Bonds is liable under the AEMLD because the tap-hole sand "reached SSAB … in a defective condition and/or in a condition that was unreasonably dangerous to SSAB as the ultimate user or consumer." (*Id.*, ¶ 26.)

In its Answer (doc. 29) to the Amended Complaint, Kem-Bonds raised a pair of affirmative defenses that are of central importance to the Motion for Partial Summary Judgment. In particular, Kem-Bonds explained that its "invoices associated with SSAB Purchase Orders numbered MB153592 and MB151229 contain a waiver of warranties and a limitation of damages." (Doc. 29, at 4.)  Kem-Bonds further pleaded that "its Invoices contain a clear and an enforceable limitation of remedy under the Alabama Uniform Commercial Code." (*Id.*)  Kem-Bonds now moves for summary judgment on the basis of those defenses.

In this posture, analysis of Kem-Bonds' Rule 56 Motion requires scrutiny of the relevant contract language contained in both SSAB's purchase orders and Kem-Bonds' invoices for the

---

SSAB's alleged property damage.").)  For summary judgment purposes, however, this factual dispute is not material to the grounds for dismissal raised in Kem-Bonds' Motion and principal brief.  Besides, the Court recognizes that, pursuant to the governing Rule 16(b) Scheduling Order, discovery to date has been confined to Kem-Bonds' fifth and sixth affirmative defenses, which are the very issues on which the Motion for Partial Summary Judgment hinges.  (*See* doc. 12, at 3-4 (asserting as defenses contractual waivers of warranties and limitations of remedies); doc. 19, at ¶ 1 ("Discovery is limited to Defendant Kim-Bonds, Inc.'s, fifth and sixth affirmative defenses ….").

subject EZ-POR. The mechanics of these transactions, the course of dealing between the parties, and the relevant contract language have not been disputed for purposes of the pending Motion for Partial Summary Judgment. What is disputed is whether the language of the SSAB's Purchase Orders or Kem-Bonds' Invoices governs, such that the parties' disagreement on summary judgment essentially boils down to a "battle of the forms."

Kem-Bonds had been selling tap-hole sand to SSAB for years prior to the June 2016 "burn-through" incidents that gave rise to this litigation. (DeSanto Aff. (doc. 37, Exh. 2), ¶ 5.) The parties' course of dealing was as follows: SSAB would contact Kem-Bonds in Missouri and place an order for EZ-POR, after which SSAB would issue a corresponding Purchase Order. (*Id.*, ¶ 6.) Upon receipt of the Purchase Order, Kem-Bonds would ship truckloads of EZ-POR to SSAB, accompanied by Invoices corresponding with each shipment. (*Id.*) Both the Purchase Orders and the Invoices were form documents containing preprinted terms and conditions that did not vary from one order or shipment to the next.

SSAB placed large orders of tap-hole sand with Kem-Bonds in both March 2016 (Purchase Order MB151229) and May 2016 (Purchase Order MB153592). (DeSanto Aff., ¶¶ 8, 13.) Each order was for ten truckloads of EZ-POR, with each truckload consisting of 46,800 pounds of tap-hole sand. (*Id.* at Exhs. B & C.)[3] Paragraph 1 of each Purchase Order provided that "[t]his Order shall be deemed to be accepted and shall be a binding contract for the sale of the Goods … upon … Supplier shipping or delivering the Goods to SSAB." (*Id.* at Exhs. B & C ¶ 1.) Paragraph 2 bore the heading "Governing Terms and Conditions," and stated as follows:

> "The terms and conditions set forth in this Order … shall together constitute the sole and exclusive agreement between SSAB and Supplier …. Acceptance of this Order is expressly limited to the terms and conditions set forth in this Order …. SSAB hereby gives notice that it objects to and rejects any terms or conditions contained in any document which has been or may in the future be supplied by Supplier to SSAB which are in addition to, different from, inconsistent with or attempt to vary any of the terms or conditions of this Order …. SSAB's acceptance of the Goods … shall not be construed as an acceptance of any terms or conditions contained in any such document."

(*Id.*, ¶ 2.) And Paragraph 4 unequivocally provided that "[n]o revision or modification of the terms and conditions of this Order shall be binding on SSAB unless such revision or

---

[3] Insofar as it might be relevant, the purchase price listed on each Purchase Order for each 468,000-pound order of EZ-POR was $67,860, which equates to $0.145 per pound.

modification is expressly accepted in writing by an authorized officer of SSAB." (*Id.*, ¶ 4.) In Paragraph 18, the Purchase Order addressed the concept of waiver by stating, "No waiver of any provision of this Order shall: (a) be binding unless given in writing and signed by an authorized officer or agent of the party to be bound thereby; or (b) imply a waiver of that provision for the future or of any other provisions in this Order unless the waiver expressly so states." (*Id.*, ¶ 18.) On its face, each Purchase Order designates Alabama law as governing its interpretation, validity and enforceability. (*Id.*, ¶ 20.)[4]

Each of SSAB's Purchase Orders also included a detailed "Warranty" provision in Paragraph 10, which SSAB's Amended Complaint accuses Kem-Bonds of violating. Paragraph 10 reads, in pertinent part, as follows:

> "In addition to any other express or implied warranties, Supplier expressly warrants that … (b) all Goods supplied … shall be … in accordance with all applicable specifications, drawings, descriptions or samples furnished and in accordance with all other requirements of this Order and the representations of the Supplier; (c) all Goods shall be of new and first class material and workmanship, shall be fit and suited for the purpose and use contemplated by this Order, and shall be of merchantable quality; (d) … all Goods … furnished shall be free from defects in material, design or workmanship for a period of 12 months from the date that … the Goods are used or put into operation by SSAB …."

(*Id.*, ¶ 10.) Kem-Bonds' evidence is that it never signed Purchase Order MB151229, although Purchase Order MB153592 was admittedly signed by Kem-Bonds, as shown in movant's own exhibits. (DeSanto Aff., ¶ 12 & Exhs. B, C.)

Notwithstanding SSAB's detailed Purchase Orders, Kem-Bonds issued Invoices to SSAB corresponding to each truckload of EZ-POR shipped by Kem-Bonds to SSAB in April, May and June 2016. (DeSanto Aff., ¶¶ 10-11, 13 & Exhs. A, D.) Each of those Invoices contained the following identical preprinted notation at the bottom of the form:

---

[4] This "governing law" provision is potentially significant insofar as Alabama law creates implied warranties of merchantability and fitness for a particular purpose, both of which SSAB alleges Kem-Bonds breached as part of Count Two (breach of warranty). *See* Ala. Code §§ 7-2-314(a) ("Unless excluded or modified …, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."), 7-2-315 ("Where the seller at the time of contracting has reason to know of any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified … an implied warranty that the goods shall be fit for such purpose.").

> "Warranty: This sale is made on the express understanding that there is no warranty of merchantability and no implied warranty that the goods shall be fit for a particular purpose. The seller shall in no event be liable for any breach or [*sic*] warranty in an amount exceeding the purchase price of the goods sold."

(*Id.*) Kem-Bonds' evidence, unchallenged by SSAB on summary judgment briefing, is that "SSAB never objected to the language in the KBI Invoices regarding the disclaimer of warranties or limiting the remedies." (DeSanto Aff., ¶ 15.) On summary judgment, Kem-Bonds seeks to enforce the disclaimer of warranties and limitation of remedies contained in its Invoices. SSAB's opposing position is that those provisions are not part of the agreement and are otherwise unenforceable.

## II.  Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.  Analysis.

As discussed, there are fundamental inconsistencies between the terms of SSAB's Purchase Orders and the terms of Kem-Bonds' Invoices for the tap-hole sand alleged to have caused the "burn-through" incidents giving rise to this litigation. SSAB's Purchase Orders

provided that (i) Kem-Bonds was expressly warranting that the EZ-POR being supplied was fit for its intended purpose, of merchantable quality, and free of defects in material, design or workmanship; (ii) the Purchase Orders contained the sole and exclusive agreement between SSAB and Kem-Bonds, with SSAB rejecting any terms or conditions contained in any document supplied by Kem-Bonds; (iii) acceptance of SSAB's offer was expressly limited to the terms and conditions of the Purchase Orders; (iv) no revision or modification of the terms of the Purchase Orders would be effective unless accepted in writing by SSAB; and (v) no waiver of any term or condition in the Purchase Orders would be binding unless it were in writing and signed by SSAB. By contrast, Kem-Bonds' Invoices specified that there was no warranty of merchantability or fitness for a particular purpose, and that Kem-Bonds' liability was capped at the purchase price of the goods sold.

To reconcile the discrepancy in contract terms, both parties look to Alabama's Uniform Commercial Code.[5] Section 7-2-207 of the Alabama Code was designed to address just this kind of scenario. *See* Ala. Code § 7-2-207 comment 1 (explaining that "[t]his section is intended to deal with" the circumstance in which there is an "exchange of printed purchase order and acceptance … forms. … Often the seller's form contains terms different from or additional to those set forth in the buyer's form. Nevertheless, the parties proceed with the transaction."). "The purpose of Section 2-207 was to alter the 'mirror' rule of common law, requiring the terms of the offer and acceptance to be identical, or to mirror each other. … Section 2-207 recognizes that in a commercial setting, the terms of the offer and acceptance will seldom mirror each other." *Burbic Contracting Co. v. Cement Asbestos Products Co.*, 409 So.2d 1, 4 (Ala. 1982). As such, § 7-2-207 holds the key to interpreting and evaluating the mismatched, conflicting terms of SSAB's Purchase Orders and Kem-Bonds' Invoices.

On its face, § 7-2-207 provides that an expression of acceptance or a written confirmation operates as an acceptance "even though it states terms additional to or different from those

---

[5] There appears to be no dispute between the parties – and no good-faith basis for disputing – that the subject transactions are governed by the Alabama version of the UCC, at least as to Counts One and Two. *See* Ala. Code §§ 7-2-102 ("this article applies to transactions in goods"), 7-2-104 comment 1 ("This Article assumes that transactions between professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer.").

offered." Ala. Code § 7-2-207(1). As such, Kem-Bonds' Invoices operate as an acceptance of the offer set forth in SSAB's Purchase Orders even though those Invoices state terms additional to or different from those in the Purchase Orders (*i.e.*, disclaimers of warranties of merchantability and fitness for a particular purpose, and limitation of remedies to recovery of the purchase price of the goods sold). The pivotal question, of course, is what becomes of the additional terms in Kem-Bonds' Invoices. Alabama's UCC provides that "[b]etween merchants such terms become part of the contract unless: (a) The offer expressly limits acceptance to the terms of the offer; (b) They materially alter it; or (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Ala. Code § 7-2-207(2).[6] As SSAB correctly points out in its Response (doc. 43), all three of those exceptions are properly in play here.

First, under a straightforward reading of the statute, the additional terms in Kem-Bonds' Invoices (again, the disclaimer of warranties and the limitation of remedies) do not become part of the contract between merchants if "[t]he offer expressly limits acceptance to the terms of the offer." Ala. Code § 7-2-207(2)(a). That is precisely what happened here. Paragraph 2 of the SSAB Purchase Orders specifies that "[a]cceptance of this Order is expressly limited to the terms and conditions set forth in this Order." Under any reasonable construction of that Paragraph 2, coupled with § 7-2-207(2)(a), the additional terms contained in Kem-Bonds' Invoices cannot become part of the contract between SSAB and Kem-Bonds because the SSAB Purchase Order (*i.e.*, the offer) expressly limits acceptance to the terms of such Purchase Order. Confronted with this argument by SSAB, Kem-Bonds remains silent. Although SSAB's Response explicitly relies on § 7-2-207(2)(a) to support its position that Kem-Bonds' Invoices' additional terms are not part of the parties' agreement, Kem-Bonds offers no rejoinder or counterargument. This unrebutted argument is fatal to defendant's Motion for Partial Summary Judgment.[7]

---

[6] There appears to be no dispute that both SSAB and Kem-Bonds qualify as "merchants" as that term is defined in the UCC. *See* Ala. Code § 7-2-104(1) ("'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction ….").

[7] At most, Kem-Bonds appears to suggest that § 7-2-207(2)(a) does not apply because "KBI's Invoice does not state that it expressly limits acceptance to SSAB's acceptance of the terms." (Doc. 38, at 6.) But this contention does not make sense. Again, the statute provides that additional terms contained in an expression of acceptance between merchants (Continued)

Second, even if § 7-2-207(2)(a) did not apply, summary judgment for Kem-Bonds would remain inappropriate because Alabama's UCC precludes the additional terms (disclaimer of warranties and limitation of remedies) in Kem-Bonds' Invoices from becoming part of the contract where "[t]hey materially alter it." Ala. Code § 7-2-207(2)(b). The official commentary to the statute recites as an example of a "typical clause[] which would normally 'materially alter' the contract … a clause negating such standard warranties as that of merchantability or for a particular purpose in circumstances in which either warranty normally attaches." Ala. Code § 7-2-207(2), comment 4. Furthermore, the Alabama Supreme Court has held that whether a limitation of remedies clause "materially alters" an agreement is a fact question. *See Burbic Contracting*, 409 So.2d at 4 ("We hold that the question of whether a limitation of remedies clause materially alters a contract is a question of fact."). More broadly, "[t]he question of whether a clause negates standard warranties or limits remedies in a reasonable manner is [a] question best resolved by the trier of fact." *Id.* at 5. Kem-Bonds offers no persuasive basis for deviating from these general principles under Alabama law. Likewise, Kem-Bonds does not meet its initial summary judgment burden of demonstrating that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law as to whether the terms of its Invoices materially alter the parties' agreement.[8] Thus, even if § 7-2-207(2)(a) did not apply (which it does), Kem-Bonds' Motion for Partial Summary Judgment would fail by operation of § 7-2-207(2)(b), and the resulting jury question presented as to whether the disclaimer of

---

become part of the contract unless "[t]he **offer** expressly limits acceptance to the **terms of the offer**." Ala. Code § 7-2-207(2)(a) (emphasis added). The "offer" here is SSAB's Purchase Order, not KBI's Invoice (which is not an offer, but an expression of acceptance that contains additional terms). Thus, whether the Invoice contains an express limitation on acceptance is of no consequence. Rather, what matters is whether SSAB's Purchase Orders (*i.e.*, the "offer" for UCC purposes) include such an express limitation. They obviously do.

[8] *See generally Wright v. DISH Network, LLC*, --- Fed.Appx. ----, 2017 WL 5035086, *2 (11th Cir. Nov. 2, 2017) ("Summary judgment is appropriate when the movant demonstrates that there is no genuine issue of material fact and it is entitled to judgment as a matter of law."); *McKeithen v. Jackson*, 606 Fed.Appx. 937, 938 (11th Cir. Mar. 31, 2015) ("The moving party has the initial burden of demonstrating through evidence that there are no genuine issues as to any material fact.").

warranties and limitation of remedies language in the Kem-Bonds Invoices "materially alters" the parties' agreement.[9]

Third, even if we were to assume that § 7-2-207(2)(a) and (b) posed no impediment to entry of summary judgment in Kem-Bonds' favor, the Motion for Partial Summary Judgment would nonetheless founder upon § 7-2-207(2)(c). That subsection provides that additional terms contained in an expression of acceptance such as Kem-Bonds' Invoices do not become part of the contract if "[n]otification of objection to them has already been given." Ala. Code § 7-2-207(2)(c). In its principal brief, Kem-Bonds summarily waves this exclusion aside, stating, "Nor did SSAB provide any objection to the terms during months and months of dealings between the parties." (Doc. 38, at 6.) But this argument cannot be reconciled with unambiguous language from Paragraph 2 of SSAB's Purchase Orders, providing as follows: "SSAB hereby gives notice that it objects to and rejects any terms or conditions contained in any document which has been

---

[9] In so concluding, the Court finds unpersuasive Kem-Bonds' arguments to the contrary. Specifically, Kem-Bonds posits that "[t]he disclaimer of warranties is 'reasonable' given the complex and dangerous nature of making steel." (Doc. 38, at 6.) However, Kem-Bonds provides no legal or factual basis that would enable this Court to make such a finding as a matter of law, nor does it explain why it equates "reasonableness" of a disclaimer of warranties with a non-material alteration. Official comment 5 to § 7-2-207 states that clause "limiting remedy in a reasonable manner" may not materially alter a contract. But there is no analogous language concerning reasonableness of disclaimers of warranties. (Reasonableness may well be the touchstone of an enforceability analysis under Alabama Code § 7-2-316, but defendant does not explain why it matters for the threshold inquiry of whether the disclaimer of warranties in the Purchase Orders is even part of the parties' agreement under a § 7-2-207 analysis. Besides, § 7-2-316 denies effect to disclaimers of warranty "when inconsistent with language of express warranty," Ala. Code § 7-2-316 comment 1, which is the operative fact pattern here.) Similarly, Kem-Bonds' reliance on the Alabama Supreme Court's ruling in *Burbic Contracting* is misplaced. True enough, the trial court in *Burbic Contracting* made a finding that a contractual limitation of remedies in a seller's acknowledgment form was not a material alteration of the agreement. (Doc. 38, at 5; doc. 47, at 4-5, 6.) But Kem-Bonds overlooks the critical detail that the *Burbic Contracting* trial court made such a finding in its capacity as finder of fact, sitting without a jury, rather than at the Rule 56 stage. *See Burbic Contracting*, 409 So.2d at 5 ("The trial judge in his order stated that the contractual limitation of remedies was not a material addition to the contract. **The findings of fact of a trial judge, sitting without a jury**, will not be reversed unless the result is clearly erroneous or manifestly unjust.") (emphasis added). Thus, Kem-Bonds advances no persuasive argument why this Court may properly make a "reasonableness" finding of fact at the Rule 56 stage on movant's showing here, even if reasonableness were sufficient, in and of itself, to render the Invoices' disclaimer of warranties part of the parties' agreement.

or may in the future be supplied by Supplier to SSAB which are in addition to, different from, inconsistent with or attempt to vary any of the terms or conditions of this Order." Movant advances no facts or argument why the objection/rejection language in Paragraph 2 is inadequate to trigger the § 7-2-207(2)(c) exclusion. Because additional terms in an expression of acceptance (in this case, Kem-Bonds' Invoices) do not become part of the agreement between merchants where the party making the offer (SSAB) has already notified the accepting party (Kem-Bonds) that it objects to such additional terms, and because SSAB's Purchase Orders clearly notify Kem-Bonds of its objection / rejection of additional terms, the disclaimer of warranties and limitation of remedies provisions in Kem-Bonds' Invoices did not become part of the parties' agreement, by the plain language of Alabama Code § 7-2-207(2)(c).

The foregoing analysis demonstrates that there are serious (and, by all appearances, insuperable) obstacles to Kem-Bonds' ability to show that the disclaimer of warranties and the limitation of remedies set forth in Kem-Bonds' Invoices are even part of the agreement between SSAB and Kem-Bonds for the purchase of the purportedly defective tap-hole sand. Accordingly, Kem-Bonds is not entitled to entry of partial summary judgment enforcing such disclaimer of warranties and limitation of remedies clauses.[10]

---

[10] In its Reply, Kem-Bonds articulates a brand-new argument that it is entitled to summary judgment on the AEMLD cause of action found at Count Three of the Amended Complaint because "SSAB cannot establish that the tap hole [*sic*] is 'unreasonably dangerous' to SSAB." (Doc. 47, at 7.) This contention fails for multiple reasons. As a threshold matter, the argument is improper because new, previously available arguments cannot be presented for the first time in a reply brief. *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) ("New arguments presented in reply briefs are generally not considered by federal courts.") (citations omitted); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 7116223, *6 (S.D. Ala. Dec. 6, 2016) ("this argument is improper because it is newly raised in a reply although it was available earlier"); *United States v. Crumb*, 2016 WL 4480690, *17 (S.D. Ala. Aug. 24, 2016) ("this kind of new, previously available argument in support of a motion is not appropriately presented for the first time in a reply"). Moreover, Kem-Bonds' "unreasonably dangerous" argument ignores the fact that no discovery has been permitted on this issue to date. The Rule 16(b) Scheduling Order specified that "[d]iscovery is limited to Defendant Kem-Bonds, Inc.'s, fifth and sixth affirmative defenses as to Counts One and Two." (Doc. 19, ¶ 1.) Those enumerated affirmative defenses related solely to the disclaimer of warranties and limitation of remedies language in the Kem-Bonds' Invoices. (Doc. 12, at 5-6.) Given that no discovery specific to the AEMLD claim has occurred thus far, it would be both premature and inequitable to entertain a summary judgment motion tailored to a particular aspect of that AEMLD claim at this time. Finally, Kem-Bonds identifies no facts that would shed light on
(Continued)

**IV.     Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant Kem-Bonds, Inc.'s Motion for Partial Summary Judgment (doc. 37) is **denied**; and
2. This matter is referred to Magistrate Judge Cassady for entry of a supplemental Rule 16(b) scheduling order addressing outstanding discovery matters, establishing additional pretrial deadlines, and fixing pretrial conference and trial term settings.

DONE and ORDERED this 27th day of December, 2017.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

whether the specific defects attributed to the EZ-POR by SSAB meet the definition of "unreasonably dangerous" or not, as viewed through the prism of an ordinary consumer's expectations.